# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

KELLY LEE WYNN,            )
                                  )
            Plaintiff,         )
                                  )
vs.                         )        Case No. 14-cv-436-CVE-TLW
                                  )
CAROLYN W. COLVIN,       )
Acting Commissioner of Social Security,  )
                                  )
           Defendant.      )

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Kelly Lee Wynn seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **REVERSED AND REMANDED IN PART and that the District Court enter a FINDING OF NO ERROR IN PART.**

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the

evidence nor substitute its judgment for that of the Commissioner. <u>See</u> <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. <u>See</u> <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a forty-nine year old male, applied for Title II benefits on May 28, 2010, alleging a disability onset date of June 1, 2009. (R. 173-174). Plaintiff alleged that he was unable to work due to pain in his groin, left hip, left leg, and his back, and memory problems due to pain. (R. 192-214). Plaintiff's claim for benefits was denied initially on January 12, 2011, and on reconsideration on October 3, 2011. (R 90-94, 98-100). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held a hearing on August 2, 2012. (R. 30-53). Following plaintiff's testimony, the ALJ had a discussion with plaintiff's attorney, determined that consultative examinations were necessary, and adjourned the hearing. (R. 48-52). The ALJ conducted a supplemental hearing on March 27, 2012. (R. 55-85). The ALJ issued a decision on April 18, 2013, finding plaintiff not disabled and denying benefits. (R. 16-26). The Appeals Council denied review, and plaintiff appealed (R. 1-5; dkt. 2).

On appeal, plaintiff raises three points of error. (Dkt. 16). First, plaintiff argues that the ALJ failed to evaluate properly the medical opinion evidence in his residual functional capacity ("RFC") findings. <u>Id.</u> Second, plaintiff contends that the ALJ's step five findings were not supported by substantial evidence. <u>Id.</u> Third, plaintiff claims the ALJ failed to discuss adequately the medical evidence relating to his RFC findings. <u>Id.</u>

Defendant has filed a response in support of the Commissioner's decision. (Dkt. 19). Plaintiff's reply was filed on May 26, 2015. (Dkt. 20).

**The ALJ's Decision**

The ALJ found that plaintiff had not performed any substantial gainful activity since his alleged onset date. (R. 18). He determined that plaintiff had the following severe impairments: "hernia, back, and bilateral hips, affective disorder, anxiety related disorder." Id. The ALJ found that plaintiff's "prostate, colon, and hernia issues, and his attention deficit hyperactivity disorder, are not severe because, considered singly or in combination, they do not result in more than a minimal impact on Mr. Wynn's ability to perform work related-functions." Id.

The ALJ determined that plaintiff's physical impairments did not meet or medically equal Listings 1.00 (Musculoskeletal System), 5.00 (Digestive System) and 6.00 (Genito-urinary System). (R. 19). The ALJ then concluded that plaintiff's mental impairments also did not meet or medically equal Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders). Id.[1] Applying the "paragraph B" criteria, the ALJ found that plaintiff had no more than moderate difficulties in activities of daily living; no more than moderate difficulties in social functioning, no more than moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. (R. 19-20). In reaching these findings, the ALJ relied on plaintiff's statements that his regular activities include watching TV, maintaining personal hygiene, performing the usual housekeeping tasks, going to physician appointments, using a computer to do Facebook and other games, that he can drive without restriction and that he can manage financial matters.

---

[1] Evaluation on the basis of mental disorders requires consideration of functional limitations described on paragraphs B and C of the adult mental listings (except 12.05 and 12.09) after the presence of a particular mental disorder is substantiated under paragraph A. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). To be deemed disabling, at least two of the following specified limitations must be established: 1) marked restriction of activities of daily living; or 2) marked deficiencies in maintaining social functioning; or 3) marked deficiencies in maintaining concentration, persistence or pace; or 4) repeated episodes of decompensation, each of extended duration. id., §§ 12.01, et seq.

The ALJ also cited the findings of Michael D. Morgan, Psy.D., who conducted a mental status evaluation on November 19, 2010, as support for these findings. Id.

In his decision, the ALJ summarized the report of Marion Sigurdson, Ph.D., who tested and interviewed plaintiff on September 29, 2012. (R. 20). The ALJ noted that Dr. Sigurdson reported plaintiff's mood was depressive and anxious, that his memory was poor, and that the subjective Beck Depression Inventory-III indicated severe subjective depression. The ALJ observed that Dr. Sigurdson reported plaintiff's Full Scale IQ obtained on the WAIS-III was 80, that she expressed DSM-IV "diagnostic impressions" of cognitive disorder NOS, pain disorder NOS, ADHA (inattentive type), R/O (rule out) PTSD), sexual disorder NOS, medical issues of back pain, groin pain, GERD, and psychosocial and environmental problems of unemployment, financial strain, poor access to health care services, limited social support, partner relational problem, parent-child relational problem, and assessed a GAF score of 50. Id.

The ALJ found plaintiff has the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, I find that Mr. Wynn has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except Mr. Wynn is restricted to occasional climbing (stairs, ladders, ropes, scaffolds, is unable to sustain more than frequent exposure to temperature of less than 40 degrees or greater than ninety degrees Fahrenheit. Mr. Wynn is limited to frequent rather than constant contact with vibration and/or vibratory tools. Mr. Wynn can do simple one-two step work that does not require more than superficial contact with co-workers or supervisors and does not involve any contact with the public. [sic]

(R. 21).

As support for his RFC findings, the ALJ cited plaintiff's testimony that stress and pain from "medical issues" adversely affect his ability to get along with co-workers and supervisors, saying: "[Plaintiff] explained that pain from his medical issues causes stress." Id. The ALJ noted that there are conflicts between plaintiff's testimony at the first hearing that he had obtained a

GED and his testimony at the second hearing that he had copied the GED document from his mother and transposed his name on it. Id. The ALJ stated that he had carefully considered the evidence and found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but found that plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. Id.

The ALJ also cited medical evidence from Brian R. Snider, Psy.D., who conducted a mental status exam on November 22, 2010. (R. 22). Dr. Snider indicated plaintiff would have adequate insight and judgment regarding common situations and every day concerns and that he appeared to have minor difficulty with complex and detailed instructions. The ALJ quoted Dr. Snider's findings that plaintiff would likely have mild difficulty concentrating and persisting through a normal workday and work week without interruptions from his psychiatric symptoms and that he would have little difficulty responding appropriately to coworkers and supervisors. Id.

The ALJ referred in his decision to the testimony of Robert Paul Borda, Ph.D., a licensed psychologist, who appeared by telephone at the second hearing. (R. 22, 57). In his decision, the ALJ explained that Dr. Borda had been asked to testify as a medical expert due to "the conflict in the evidence between the psychological reports of Drs. Morgan and Sigurdson." (R. 22). Dr. Borda testified that he had reviewed plaintiff's medical records before the hearing. (R. 58). Citing Dr. Borda's professional expertise as a neuropsychologist and "his access to [the] whole of the medical and psychological evidence," the ALJ gave "great weight" to Dr. Borda's opinion that plaintiff experienced "pain to the degree it would impose interruptions in concentration, but would not significantly interfere with the claimant's ability to perform simple tasks" and that incidental and superficial contact with the public would not be precluded. (R. 22).

The ALJ also noted the consultative examination report of Beau C. Jennings, D.O., records from Geoffrey Day, M.D., James Bissland, D.C., and Andrew D. Wright, M.D., and RFC Assessments from Luther Woodcock, M.D., and Judy Snelling, D.O., M.P.H. (R. 22-23). The ALJ reviewed records from plaintiff's treating physicians and physical therapists. (R. 23). He acknowledged the notation by Skika Ayyagari, M.D., of problems with ambulation and gait on May 3, 2011, and similar findings by Corey Babb, D.O., on August 16, 2011. Id.

The ALJ stated he had considered all plaintiff's symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence in reaching his RFC determination. (R. 21). He affirmed that he had carefully and specifically considered plaintiff's subjective symptoms and complaints and found plaintiff's testimony of pain credible to the extent that his ability to perform light work was impeded by additional limitations as identified in his RFC finding. The ALJ cited the testimony of the vocational expert (VE) at the supplemental hearing as evidence that there are a substantial number of regional and national jobs available that plaintiff could perform and found; therefore, that plaintiff is not disabled. (R. 25-26).

**Plaintiff's Medical Records (Mental)**

The medical evidence regarding plaintiff's mental impairment(s) consists of reports from two medical consultants who examined plaintiff prior to the first hearing, Michael D. Morgan, Psy.D., and Brian R. Snider, Ph.D. The record also contains the report of Marion Sigurdson, Ph.D., PLLC, who examined plaintiff after the first hearing. Robert Paul Borda, a licensed psychologist, did not examine plaintiff, but reviewed the medical record and testified by telephone at the second hearing as a medical expert.

**Dr. Morgan's Mental Status Examination**

Michael D. Morgan, Psy.D., a licensed clinical psychologist, examined plaintiff on behalf of the administration on November 19, 2010. (R. 429-433). Dr. Morgan noted plaintiff's chief complaint was that his ability to work was limited by ADD, enlarged prostate, colon, hernia, and LD. (R. 429). Plaintiff reported he had not received any form of mental health treatment for the last two years because he had been unemployed and could not afford treatment. Id. He stated he took medication in 1994 because his wife thought he had ADD. Id. He told Dr. Morgan that he sleeps from 2:00 A.M. to 2:00 P.M., but wakes up one to two times per night. Id. He often naps during the day. Id. His appetite was good and he had a twenty-five pound weight gain in the last year. Id.

Dr. Morgan said:

> The discourse about his social functioning and his ability to perform self-care tasks indicate that his motivation level is currently within normal limits. The discourse about his vegetative symptoms and his social functioning indicated that his mood is currently euthymic [normal]; and his affect was mood congruent [agreeable] during the interview.

(R. 430).

Plaintiff reported regular contact and stable relationships with family and others. Id. Regular activities included watching TV, maintaining personal hygiene, housekeeping tasks, going to doctor appointments, and using a computer to do Facebook and other games. Id. Plaintiff was able to take care of all his personal grooming needs and stated that he performs most of the usual housekeeping tasks. Id. He said he drives without restriction and can manage financial matters. Id. He related he can engage in some strenuous activity by taking frequent breaks. Id. Plaintiff reported that if he engages in too much strenuous activity, his back pain level can increase and then the pain exacerbates his anxiety and depression. Id. He reported a very

dysfunctional childhood with an alcoholic and physically abusive step-father who was eventually killed by his mother in self-defense and that he was in counseling to resolve those issues. Id. He was married two times, had two children and had recently reconnected with his son. Id. He had been married to his current spouse for 20 years and rated that relationship as good. Id. Plaintiff said he repeated grade four, completed grade seven and that his grades were in the low-average range. Id. He quit school after grade seven because of his father's poor parenting skills. Id. He attended Tulsa Welding School but had to quit due to financial problems. Id. Plaintiff reported a remote history of substance dependence that ended 20 years ago. (R. 431). He related he cleaned up through AA and NA programs. Id.

Dr. Morgan reviewed medical records from Dr. Bissland, DC, dated September 17, 2010, which reported the presence of back pain due to a misalignment of the spine with a good prognosis. Id.

Dr. Morgan observed no signs of hyperactivity during the interview. Plaintiff was well focused and attentive to the task at hand throughout the course of the 50-minute examination. Id. Plaintiff had arrived on time, read, signed, and dated the consent form correctly without assistance and knew his social security number and date of birth from memory. Id. Dr. Morgan reported plaintiff was within normal limits concerning orientation to time, place, person and purpose and had no significant impairment in transferring newly learned information to long-term memory. Id. His speech was normal. Id. He did not meet the criteria for major depressive disorder, bipolar disorder or personality disorder. Id.

Dr. Morgan determined plaintiff did meet the criteria for an anxiety disorder not otherwise specified (NOS):

> . . . that likely stems from the effects of acute back pain. That pain was reported to come from a misalignment of his spine. His symptoms appear to

be transient in nature and can include: feeling on edge, sleep disturbance, problems with concentration, dysphoria weight change and decreased motivation. At the time of this interview his anxiety seemed to be largely in remission. He might benefit from pain management counseling.

Id.

Dr. Morgan reported plaintiff's thought process was normal, lacking signs of organic impairment or psychosis. Id. He reported no history of suicidal behavior and was not currently homicidal or suicidal. Id. Overall, he was logical, coherent and goal directed. Id. Based upon plaintiff's education history and Dr. Morgan's observations, plaintiff was assessed to be operating at the average level of intelligence. Id. Dr. Morgan determined plaintiff had good social judgment and insight and his ability to make work decisions appeared to be good. (R. 432).

Dr. Morgan's diagnostic impression was Anxiety Disorder Not Otherwise Specified, Back pain (By medical report), Unemployment, and financial difficulties. He assessed a GAF score of 76-80. Id.[2].

Under Prognosis, Dr. Morgan wrote: "This claimant reports signs and symptoms consistent with an anxiety disorder not otherwise specified that likely stems from the effects of acute back pain. At the time of this interview his anxiety seemed to be largely in remission. He might benefit from pain management counseling." Id.

**Dr. Snider's Mental Status Exam**

Brian R. Snider, Ph.D., conducted a Mental Status Exam of plaintiff on November 22, 2010, on behalf of the Disability Determination Unit. (R. 434-437). He reported plaintiff drove himself to the appointment, arrived on time and was unaccompanied in the exam room. He was

---

[2] A GAF score is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).

the informant for the exam and appeared to be an adequate historian. (R. 434). Plaintiff denied significant psychiatric symptoms. <u>Id.</u> Plaintiff denied any inpatient admissions and reported he was not currently receiving outpatient psychiatric care. <u>Id.</u> He denied any significant sadness but complained of decreased energy, insomnia, irritability, difficulty thinking clearly, and forgetfulness, which he attributed to physical pain "he is allegedly suffering." <u>Id.</u> He stated he has been married twice, divorced once, with his current marriage lasting twenty years. <u>Id.</u> He reported he had a seventh grade education but received his GED. (R. 435). He gave a work history consisting of temporary labor and welding jobs intermittently after having worked at Plaza Hills East Apartments for six years as a porter. <u>Id.</u> Dr. Snider reported that: "Mr. Wynn denies that psychiatric symptoms ever interfered with his employment." <u>Id.</u>

Plaintiff's reported daily activities consisted of sitting in a recliner and playing on a laptop all day. <u>Id.</u> Plaintiff stated he cannot do chores because of pain between his legs that he attributed to a prostate problem. <u>Id.</u> He said he could drive no more than thirty minutes because of pain. <u>Id.</u> He denied any problems with self-care and reported he socializes with two people who live nearby every other week. <u>Id.</u>

Dr. Snider's mental status examination revealed adequate hygiene and "somewhat of a disheveled appearance." <u>Id.</u> Plaintiff's affect was broad and his mood appeared to be upbeat. <u>Id.</u> His posture was relaxed and no involuntary movements were reported or observed. <u>Id.</u> He ambulated slowly and gingerly. <u>Id.</u> He was friendly and cooperative. <u>Id.</u> His speech was normal rate and rhythm and his thought content seemed logical and coherent. His reality testing appeared to be intact. <u>Id.</u>

Plaintiff gave correct responses to questions regarding the date, day of week, month, year, season, city, county, state, and location of his appointment. <u>Id.</u> On the registration task,

plaintiff was able to repeat three simple words, and several minutes later he was not able to recall any of the words from registration. (R. 435-436). He correctly identified an ink pen and watch. (R. 436). He was able to repeat the statement "no ifs, ands, or buts" without difficulties and he followed a three stage command without problems. Id. He wrote a complete sentence without difficulty and he was able to draw two overlapping pentagons accurately. His score on the Mini-Mental Status exam was 23 points out of a possible 30 points. Id.

Plaintiff's IQ appeared to be in the low-average range. Id. His insight and judgment regarding common situations and every day concerns appeared to be adequate. Id.

Dr. Snider said:

> During this exam, he appeared to have mild difficulty with memory and concentration. Mr. Wynn would probably have minor difficulty understanding and carrying out simple instructions and would likely have mild difficulty with complex and detailed instructions. He is likely to have mild difficulty concentrating and persisting through a normal work day due to psychiatric symptoms. His ability to maintain a normal workday and work week without interruptions from his psychiatric symptoms is likely mildly impaired. In all likelihood, he would have little difficulty responding appropriately to coworkers and supervisors. Mr. Wynn appears capable of managing his own funds responsibly.

Id.

Dr. Snider declined to list his diagnostic impressions, recommendations, or prognosis. Id.

**Dr. Sigurdson's Disability Evaluation Report**

Marion Sigurdson, Ph.D., PLLC, examined plaintiff on behalf of the DDU on September 24, 2012.[3] (R. 536-550). Plaintiff's chief complaints were pain in his groin and low back, and poor memory. (R. 536). Plaintiff arrived on time for the appointment and was accompanied by his wife. Id. He was dressed in casual clothing, walked with a cane, wore his bifocals, and had clean, short fingernails, very short hair, and no facial hair. Id. Dr. Sigurdson stated that the

---

[3] Dr. Sigurdson's examination was conducted after the first hearing because the ALJ concluded that a "more detailed examination" was warranted. (R. 48).

information in her report was gleaned from an interview with plaintiff, her own observations, mental status examination, psychological testing, review of plaintiff's wife's written comments, and review of records received prior to the appointment. She noted that she did not receive copies of the Adult Disability or Disability Function Reports, but that she had reviewed Dr. Morgan's report. Id.

Dr. Sigurdson quoted plaintiff's wife's written comments extensively. (R. 537). Those comments included plaintiff's reported history of physical abuse he suffered during his childhood, and drug abuse by him in his youth. Id. Plaintiff's wife reported plaintiff's "memory and thinking" had gotten worse during their twenty-two year marriage and that he gets lost and does not keep himself groomed. Id. She reported that plaintiff has never been able to excel at a job because of his "lack of following directions" but that he has always been loyal and dependable on a job. Id. She said he would not draw unemployment [compensation] and took menial jobs with temporary agencies and that was "how he hurt himself physically while shoveling brick." Id. She said plaintiff would not go to the doctor when he had insurance and "It's like now everything is catching up on him from mental and physical neglect. … There is something wrong with his thinking process." Id.

Plaintiff's subjective complaints as recorded by Dr. Sigurdson were:

(1) Back and leg pain: Mr. Wynn reported he injured his low back in 1996 when he fell from a ladder. In 2010 he received treatment for his low back pain from Dr. Bissland, a chiropractor, and reported he was told an x-ray showed a 'bulging disc somewhere in [his] back.' His left hip and leg go numb and he loses his balance so he began using a cane two years ago. He can't stand or sit for more than a few minutes without discomfort.

(2) Groin pain: He sustained an on the job injury to his groin while lifting bricks at Acme Brick (June/July 2009). The pain was sharp and he had to quit work immediately. The temporary agency he worked for sent him to a doctor and he had a few physical therapy sessions, but they did not resolve his problem. He does not know the diagnosis he was given. He reported the pain never resolved and the injury limits his physical activities.

(3) Memory: He reported memory problems have worsened over the last few years and he has gotten lost driving in familiar areas. He can't stay organized and finds it difficult to learn and retrieve information.

Id.

Dr. Sigurdson repeated plaintiff's recitation of his medical treatment history and substance abuse history. (R. 538). Plaintiff told Dr. Sigurdson that he had attempted suicide when he was a teenager. Id. He abused various drugs from ages thirteen to twenty-two, but stopped with the help of AA and NA without significant relapses. Id. He had one misdemeanor conviction for possession of an illicit drug in 1990. Id. After achieving abstinence, he continued to struggle with attention, concentration, and organization and saw Dr. Johnson who prescribed Wellbutrin and Ritalin for ADD. Id. He took the medications for about ten years and discontinued them after he lost his job and health insurance in 2005. He attributed many of his past and current emotional problems to unresolved trauma issues. Id.

Dr. Sigurdson conducted a Mental Status Exam, the Wechsler Memory Scales-III, Wechsler Adult Intelligence Scales-III, Wide Range Achievement Test-III, Bender Gestalt, and Halstead-Reitan Battery of Neuropsychological Tests. Her observations of plaintiff's behavior during the administration of the tests and the test results were extensively documented in her report. (R. 539-543). Her diagnostic impressions were Cognitive disorder, NOS, Pain disorder associated with both psychological factors and a general medical condition, Anxiety disorder NOS, Depression NOS, Sleep disorder NOS, ADHD, inattentive type, R/O PTSD, Sexual disorder NOS, Back pain, groin pain, GERD by claimant report, and she assigned a GAF of 50. (R. 543-544).

Dr. Sigurdson also filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form. (R. 548-550). She indicated plaintiff had no limitations on his ability to

understand and remember simple instructions, carry out simple instructions and ability to make judgments on simple work-related decisions. (R. 548). She assessed marked limitations in plaintiff's ability to understand and remember complex instructions, carry out complex instructions and ability to make judgments on complex work-related decisions. Id. Dr. Sigurdson assessed a mild limitation in plaintiff's ability to interact appropriately with the public but extreme limitations on ability to interact appropriately with supervisor(s) and co-workers. She also assigned an extreme limitation in plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. 549). She identified General Memory – Index 70 and Auditory Immediate Memory – Index 50, test results as factors supporting her assessment and she wrote: "Memory issues will specifically limit his ability to meet employment demands." Id.

**Dr. Borda's Testimony**

Robert Paul Borda, Ph.D., a licensed psychologist, testified by telephone at the supplemental hearing held on March 27, 2013. (R. 54-63). Dr. Borda did not personally examine plaintiff, and his testimony was based on his review of the medical records. (R. 58). Dr. Borda testified that plaintiff's "primary problem is chronic pain secondary to back injury and groin injury." Id. He acknowledged Dr. Sigurdson's tests, noting that the sub-tests on the WAIS did not indicate the typical profile of someone who has had brain injuries. Id. He also ruled out PTSD as not documented. (R. 59). He testified that he suspects plaintiff has "kind of been functioning at that below average range for all of his life. But apparently recently has had some decline in memory and increase in depressive symptoms which may well be linked." (R. 58-59). Dr. Borda saw no neurological evidence of brain injury. (R. 59). He testified that the only symptoms of depression he found in the medical evidence were impaired concentration,

psychomotor agitation, and sleep disturbance "which would not be a sufficient number to satisfy the A criteria of the listings." Id. Plaintiff does have, Dr. Borda testified, a generalized anxiety disorder. Id. He said: "Looking at the B criteria, just from cognitive emotional standpoint I think activities of daily living would be impaired to a moderate degree. It's reported that he needs reminders of daily activities but otherwise he's fully independent. Social functioning I read is moderately impaired, he has no social activities outside of the house. Concentration, persistence, and pace moderately impaired. No extended episodes of decompensation." Id. Dr. Borda found no evidence that the C criteria for 12.04 or 12.06 was satisfied. Id. He concluded that plaintiff does not meet or equal any mental or physical listing. Id. As to functional limitations, Dr. Borda testified:

> I think the functional limitations that would be present in a work like setting primarily would have to do with interruption, concentration from pain but I think he'd be capable of performing simple one, two step operations adequately. He would have marked difficulty with detailed or complex work. Interacting with coworkers, supervisors, and the public would be moderately impaired. Ability to deal with normal work stress would be moderately impaired.

(R. 59-60).

The ALJ asked a follow-up question:

> I'm somewhat – you indicate that he has a marked degree of problems in the social area but only moderately impaired with dealing with supervisors, and coworkers, and with well work stress may or may not be social, that could be any number of things. But why is either the work functioning limited to moderate or why is the social under criteria B considered marked?

(R. 60).

To which, Dr. Borda responded:

> It appears that his lack of social interaction is due to lack of interest in socializing not the inability to socialize. I think in a work setting, if he had to he could socialize adequately with coworkers and the public. He wouldn't be

particularly good at it. It wouldn't preclude any work, any job, is what I'm saying.

Id.

The ALJ then asked:

> Okay and moderately impaired, would he be able to have superficial contact with coworkers and supervisors meaning something that's not intense like team building or trying to persuade or handle complaints in the complaint department, things like that. He wouldn't be able to do that but regular type of contact between employees would be permissible?

(R. 60-61). Dr. Borda answered in the affirmative. He also testified that plaintiff would not be the first choice "to put out on the frontline to meet the public," that such contact would not be totally precluded but "would just have to be almost incidental." (R. 61).

Plaintiff's attorney asked Dr. Borda if he was "taking into account pain also. Do you think that would interfere with his ability to complete an eight hour day at all? Do you think that would get him any limitations whatsoever or are you taking that into account?" Id.

To which Dr. Borda gave the following response:

> I'm taking it into account, it's very difficult to quantify it just from looking at the records. I know it would impair his abilities to sustain concentration. How many interruptions there would be in an eight hour work day I can't tell you, that would be a sheer guess on my part. I know it would be a factor but how much of one I can't tell you.

(R. 61-62).

At this point, the ALJ asserted that he did not want Dr. Borda to speculate on the number of unscheduled breaks plaintiff might need, saying "That's guessing and I can guess as well as anybody." (R. 62).

## ANALYSIS

Plaintiff contends the ALJ failed to properly evaluate the medical opinion evidence, that his findings were not supported by substantial evidence and that he failed to adequately discuss

the medical evidence related to his RFC determination. (Dkt. 16 at 3). Defendant ("the Commissioner") responds that the ALJ reasonably considered and weighed the record evidence. (Dkt. 19 at 4-7).

**Medical Opinion Evidence (Mental)**

First, plaintiff asserts that the ALJ erred by failing to evaluate Dr. Sigurdson's opinions under the relevant factors required by the regulations. (Dkt. 16 at 3-4). The Commissioner argues that the basis for the ALJ's findings may reasonably be discerned from a reading of his decision as a whole and that he reasonably reconciled the conflicting evidence of record. (Dkt. 19 at 6).

It is a well-known and overarching requirement that an ALJ must consider every medical opinion in the record. See 20 C.F.R. § 404.1527(c). In this case, the record contains no medical opinion from a treating source regarding plaintiff's mental impairments. The only evidence available to the ALJ regarding plaintiff's mental impairments were the reports from Drs. Morgan and Snider, which were written almost two years before the first hearing. (R. 429-437). The ALJ recognized the necessity of developing the record and sent plaintiff for a consultative mental examination. (R. 48-52). That examination, conducted by Dr. Sigurdson, produced an opinion that plaintiff had no limitations in his ability to understand, remember, and carry out simple instructions, and make judgments on simple work related decisions; that he had marked limitations in ability to understand, remember, and carry out complex instructions and make judgments on complex work related decisions; that he had a mild limitation in ability to interact appropriately with the public; and that he had extreme limitations in ability to interact appropriately with supervisor(s) and co-workers, as well as an extreme limitation in ability to respond appropriately to usual work situations and changes in a routine work setting. (R. 547-548).

Although the ALJ did appear to compare certain points of Dr. Sigurdson's report with Dr. Morgan's report in his decision, he did not weigh Dr. Sigurdson's report. He summarized it and then, presumably, rejected it in favor of the opinion of Dr. Borda, a non-examining medical source.[4]

The regulations require the ALJ to consider several specific factors in weighing a medical opinion. See 20 C.F.R. § 404.1527(c)(1)-(6); Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004) (opinions from examining psychologists are generally entitled to less weight than those of a treating source, and the opinions of non-examining psychologists who have never seen the claimant are generally entitled to the least weight of all.). In this case, the consultative examiners' reports are the only medical evidence in the record pertaining to plaintiff's mental impairments. When there is no treating physician opinion, an ALJ "must explain in the decision the weight given to the opinion of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist …" 20 C.F.R. § 404.1527(e)(2)(ii), see also Keyes-Zachary v. Astrue, 695 F.3d 1156, 1161 (10th Cir. 2012) (holding that when an ALJ does not give controlling weight to the treating physican's opinion, he must weigh all of the medical opinions).

Therefore, the ALJ's failure to evaluate Dr. Sigurdson's opinion using the appropriate factors and his failure to state the weight he gave it constitutes reversible error. An examining medical-source opinion may be dismissed or discounted, of course, but any such finding must be based on an evaluation of all of the factors set out in the cited regulations and the ALJ must provide specific, legitimate reasons for rejecting it. Chapo v. Astrue, 682 F.3d 1285, 1291 (10th

---

[4] The undersigned notes that Dr. Borda did not expressly address Dr. Sigurdson's findings or render an opinion as to their validity.

Cir. 2012) (opinions by consultative physicians must be evaluated in accordance with certain factors identified in 20 C.F.R. § 404.1527(c)).

The ALJ summarized the reports by Drs. Morgan and Snider, both consultative examiners, but he did not discuss the reports or demonstrate that he had weighed their opinions under the appropriate factors. In a footnote, the Commissioner asserts that the ALJ had no duty to discuss the "offhanded/casual observations" by the psychologists related to plaintiff's shifting position and complaints of pain. (Dkt. 19 at 5). However, with regard to plaintiff's mental impairments, the weight the ALJ accorded the opinions of the psychologists is relevant, especially if he relied upon them as evidence that conflicts with the opinion of Dr. Sigurdson. It is the ALJ's duty to give consideration to all the medical opinions in the record. See 20 C.F.R. § 404.1527(c). An ALJ is required to review all of the evidence relevant to a claim and make findings about what the evidence shows. See id.

Contrary to the Commissioner's argument, the ALJ did not reconcile the conflicts in the medical evidence in his decision. Instead, he merely stated that he gave "great weight" to the opinion of Dr. Borda, who did not examine plaintiff but only reviewed the medical records, without articulating the analysis and reasoning that he applied while doing so. To the extent there are differences of opinion among the medical sources, the ALJ must explain the basis for adopting one and rejecting another, with reference to the factors governing the evaluation of medical source opinions set out in 20 C.F.R. § 404.1527(c). The undersigned finds the ALJ's failure to adequately discuss and evaluate the medical evidence regarding plaintiff's mental impairments provides the Court with no basis for judicial review and recommends reversal for reconsideration under the proper guidelines established by the regulations and the courts.

## Moderate Limitation on Work Stress

Plaintiff also alleges as error the ALJ's failure to incorporate the moderate limitation in plaintiff's ability to tolerate normal work stress assessed by Dr. Borda into the RFC he proffered to the vocational expert ("VE") at the hearing. (Dkt. 16 at 7). The Commissioner argues that plaintiff's own testimony demonstrated that his stress stemmed from social interactions and, as such, the social limitations in the RFC accounted for his stress. (Dkt. 19 at 7).

The hypothetical the ALJ presented to the VE did not include the limitation stated by Dr. Borda: "Ability to deal with normal work stress would be moderately impaired." (R. 60, 78-80). While there was some discussion at the hearing regarding the moderate limitations assessed by Dr. Borda, the focus was upon plaintiff's ability to interact appropriately with supervisors, co-workers and the public. (R. 60). The ALJ stated that "work stress may or may not be social, that could be any number of things" but he did not further explore the parameters of the limitation and he did not state whether he accepted, rejected or modified the moderate limitation when he assessed plaintiff's RFC. Id.

Plaintiff's attorney asked the VE the following question:

> Okay. If – I know the judge kind of went between both doctors but if we actually did give him extreme limitations in interaction with supervisors and coworkers and an inability to respond appropriately to usual work situations and changes in work settings were all extreme would that rule out competitive employment in itself?

(R. 81). To which the VE answered: "Yes, it would." Id. The ALJ offered no follow-up questions to the VE on that issue.

Although the ALJ gave "great weight" to Dr. Borda's opinion, he provided no explanation in his decision for not including in his RFC determination, the moderate limitation Dr. Borda had assessed in plaintiff's ability to deal with normal work stress. This is a critical

omission. In formulating a claimant's RFC, an ALJ must consider the limitations from acceptable medical sources concerning the ability to "respond appropriately to supervision, co-workers and **work situations.**" (emphasis added). SSR 96-8p, 1996 WL 374184, at *6. <u>See Clifton v. Chater</u>, 79 F.3d 1007, 1010 (10th Cir. 1996) (holding that in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significant probative evidence he rejects). While it may be true that the ALJ had this limitation in mind when he assessed plaintiff's RFC to simple work with "social limitations," as the Commissioner contends, the court cannot adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the decision itself. <u>See Haga v. Astrue</u>, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Because the RFC determination requires clarification on this issue, the undersigned finds the ALJ's decision is not based upon substantial evidence. For this reason, the undersigned recommends that the case be remanded for the ALJ to incorporate this limitation into his RFC findings or explain his reasons for not doing so. If necessary, the ALJ should be free to elicit additional information regarding the impact of this limitation from a vocational expert.

**<u>The ALJ's Step Five Findings</u>**

Plaintiff raises an allegation of error in his Opening Brief concerning the ALJ's reliance upon the vocational expert's testimony for his finding that a significant number of jobs exist in the economy that plaintiff could perform with his RFC. (Dkt. 16 at 9-10). He contends that only jobs with a reasoning development level of one ("R1") would have accommodated his RFC limitation to simple one-two step work. <u>Id.</u> However, the Tenth Circuit has held that a "limitation to simple, repetitive, and routine work" is "inconsistent with the demands of level-three reasoning but consistent with the demands of level-two reasoning." <u>Stokes v. Astrue</u>, 274

F.App'x 675, 684 (10th Cir. 2008) (unpublished)[5] (applying the analysis employed in <u>Hackett</u>, 395 F.3d at 1176). Plaintiff concedes all the jobs identified by the VE are unskilled ("SVP 2") with reasoning development levels of two ("R2"). (Dkt. 16 at 10; dkt. 20 at 3). The undersigned finds there is no basis for reversal on this issue. Nonetheless, since the ALJ must revisit his RFC findings in light of plaintiff's mental impairments, his step five findings may also be clarified upon remand.

**<u>Exertional Demands of Light Work</u>**

Plaintiff asserts in his third allegation of error that the ALJ failed to properly discuss the medical evidence as it relates to his capacity to perform the exertional demands of light work. (Dkt. 16 at 10-11). He concedes that the ALJ "recited" the opinions of the consultative physicians, the x-rays relied upon for those opinions, "a portion of chiropractic physician Dr. James Bissland's July 2010 examination and x-ray findings," his physical therapy and chiropractic treatment notes, and Dr. Babb's August 2011 findings. (Dkt. 16 at 11). Plaintiff points to x-rays by Dr. Bissland on July 7, 2010, and follow-up notations throughout his treatment period from that date to September 24, 2010, as evidence that the ALJ failed to properly consider all of Dr. Bissland's findings and additional notations regarding plaintiff's symptoms. (Dkt. 16 at 11-13; R. 425). He complains that the ALJ did not acknowledge that his objective abnormalities continued throughout his treatment with Dr. Bissland. (Dkt. 16 at 11-12).

As the Commissioner points out; however, plaintiff has not explained how the ALJ's recitation of each and every notation made by Dr. Bissland would have changed the outcome of his physical RFC findings. (Dkt. 19 at 5). The ALJ assessed limitations on more than light exertional activity "due to the claimant's back problems." (R. 22-23). It is clear from the decision

_____

[5] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

that the ALJ considered all the records, including the follow-up notations of Dr. Bissland. (R. 23). The same is true of the additional findings of Dr. Babb that plaintiff claims the ALJ should have "discussed." (Dkt. 16 at 13-14). The ALJ concluded that plaintiff's physical limitations would not allow him to return to the heavy work he previously performed. (R. 25, 80). He acknowledged that plaintiff would experience some pain or discomfort, but that he was not precluded from performing light exertional activity with additional limitations of occasionally climbing stairs, ladders, ropes, scaffolds, temperature extremes, and vibratory tools. (R. 21, 25-26). The ALJ adequately discussed the evidence regarding plaintiff's physical impairments and explained his findings. That is all he was required to do. See Wilson v. Astrue, 602 F.3d 1136, 1148 (10th Cir. 2010) ("There is obviously no requirement that the ALJ reference everything in the administrative record."); Clifton, 79 F.3d at 1009-10 (ALJ is not required to discuss every piece of evidence)). The undersigned finds plaintiff's third allegation of error is without merit and, therefore, recommends a finding of no error on this issue.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED AND REMANDED IN PART.** Upon remand, the ALJ should properly assess the medical-source evidence regarding plaintiff's mental impairments. Specifically, the ALJ should state the weight he accorded the medical source opinions and explain his rationale for accepting and rejecting the material findings in the medical source opinions. He should also revisit the RFC determination after resolving the question of the impact that plaintiff's mental impairment(s), particularly the limitation on plaintiff's ability to deal with normal work stress, has on his RFC in light of that resolution. The undersigned **RECOMMENDS** the District Court find **NO REVERSIBLE ERROR** with regard to the ALJ's

RFC findings regarding plaintiff's physical limitations. See Wells v. Colvin, 727 F.3d 1061, 1066 (10th Cir. 2013) (reversing and remanding on the mental impairment issue while finding no reversible error in other aspects of the ALJ's decision).

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by October 28, 2015.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 14th day of October, 2015.

T. Lane Wilson
United States Magistrate Judge